## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

EVEN LABS INC.,
313 N. Plankinton Ave., Ste. 311
Milwaukee, WI 53203

    and

ENRIQUE RODRIGUEZ,
c/o EVEN Labs Inc.
313 N. Plankinton Ave., Ste. 311
Milwaukee, WI 53203

                         *Plaintiffs,*

      v.

DARRYL DAMIEN WASHINGTON
(a/k/a DAMIEN "DDOT" WASHINGTON),
P. O. Box 1468
Hyattsville, MD 20785
(Prince George's County)

                         *Defendant.*

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiffs EVEN Labs Inc., ("EVEN" or "EVEN Labs") and Enrique "Mag" Rodriguez ("Rodriguez") (together, the "EVEN Plaintiffs"), by and through their undersigned counsel, for their Complaint against Defendant Darryl Damien Washington (a/k/a Damien "DDOT" Washington) ("Washington") hereby allege as follows:

## NATURE OF THE ACTION

1.    Plaintiff EVEN is an early-stage music-sharing platform sitting at the intersection of music and technology, with a mission to service artists and other rights holders by allowing them to release their music directly to fans prior to release on larger streaming platforms where

artists often feel disconnected from their fans and receive diminished revenue for their work.

2.     Defendant Washington is a former independent contractor of EVEN who was terminated from that position on September 4, 2025.

3.     After his termination, Defendant has publicly made and published defamatory, false, and malicious statements on various websites and social media accounts that he set up under various aliases.   In addition, Washington accessed and continues to access confidential and proprietary information of EVEN through two EVEN devices (a laptop and an iPhone) issued to him during his tenure as an EVEN consultant, and which he has refused to return (the "Stolen EVEN Devices"), despite numerous Court orders in an unrelated case to return the laptop and allow both devices to be imaged.   Those devices contain confidential information from the administrative back-end of EVEN's online music sharing platform, EVEN's customer contact list including business partners and prospective business partners, early draft slide presentations for potential investors that were not shared outside of EVEN, and other secret company information.

4.     Using the Stolen EVEN Devices, Defendant has misused EVEN's proprietary information to send several defamatory emails to EVEN's investors, business partners, and customers.   Those emails included a link to a confusingly similar "shadow" website repeating the defamatory, false and misleading information.   Defendant continues to disseminate false and misleading statements about EVEN's integrity and business offerings, both through email and on social media platforms, causing confusion among its constituents and injury to EVEN's business.

5.     In addition to the irreparable harm caused by Defendant's intentionally defamatory, false, harassing and threatening statements, Defendant's tortious misconduct violates the Federal Defend Trade Secrets Act, the Cybersquatting provisions of the Lanham Act, infringes EVEN's federal trademark, and violates related Maryland statutes.   Defendant's defamatory and harmful

actions are ongoing, directed at Plaintiff's customer base and business operations, and if not stopped promptly, threaten to reveal further confidential and sensitive information that jeopardizes the EVEN Plaintiffs' various professional, personal, and financial interests.

6.    The EVEN Plaintiffs therefore seek injunctive relief from this honorable Court: (*i*) to prevent further irreparable reputational harm and loss of goodwill in EVEN's community; (*ii*) to shut down the intentionally confusing magrodriguezfraud.com and Defamatory Email account; (*iii*) to prevent further economic harm to EVEN's future business interests; (*iv*) to retrieve the Stolen EVEN Devices; (*v*) to prevent future trademark infringement; and (*vi*) to provide any further relief this Court may deem just and proper.

## PARTIES

7.    Plaintiff EVEN Labs Inc. is a Delaware corporation with a principal place of business at 313 N. Plankinton Ave., Suite 311, Milwaukee, WI 53203.

8.    Plaintiff Enrique "Mag" Rodriguez is the Chief Executive Officer of Plaintiff EVEN, and resides in Milwaukee, Wisconsin.

9.    Defendant Damien "DDOT" Washington (whose full legal name is Darryl Damien Washington), is an individual who is domiciled in and resides in Prince George's County, Maryland.  Defendant's domiciliary status in the state was confirmed while working as an independent contractor for EVEN as his consulting payments were delivered to a Maryland bank account, invoices for his services were sent from a Maryland address, and in a litigation pending in New York, Washington produced a lease and a driver's license, indicating he lives in Maryland.

## JURISDICTION AND VENUE

10.    This Court has personal jurisdiction over Defendant Washington because he is domiciled in Maryland and, at all relevant times, resided in this State.  In addition, Defendant

purposefully availed himself of conducting activities in Maryland by executing an independent-contractor agreement with EVEN while a Maryland resident, and by directing and receiving compensation through that agreement to his Maryland address.  Personal jurisdiction is therefore proper under Maryland's long-arm statute, Md. Code, Cts. & Jud. Proc. § 6-103(b)(1)-(2), and consistent with due process.

11.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert federal questions under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(c), and the Lanham Act, 15 U.S.C. § 1125.  Jurisdiction also lies under 28 U.S.C. § 1338(a) (acts of Congress relating to trademarks and unfair competition).  In addition, the Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because the parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs, as alleged herein. This Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367(a).

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in Prince George's County, Maryland and a substantial part of the events or omissions giving rise to these claims occurred while Defendant was a resident of this judicial district.

## RELEVANT FACTS

### A. The EVEN Plaintiffs, and EVEN's Confidential Business Information and Trade Secrets.

13.     Plaintiff Enrique "Mag" Rodriguez incorporated EVEN Labs Inc. in February 2022, launched a beta-version of the platform in March 2023, and launched the platform publicly in April 2024.

14.     Plaintiff EVEN Labs Inc. is a direct-to-fan music platform that connects artists directly with their most loyal fans.  Through the EVEN platform, fans can support their favorite artists by purchasing music and packages that can provide a variety of exclusive perks such as,

exclusive content, direct interactions with the artists, priority access to tour tickets, merchandise, and other creative works that the artists themselves choose.  One of EVEN's benefits is that artists provide early access to new music releases before they reach larger streaming platforms.  This unique model is designed to mutually benefit both the artists and fans in a way that larger streaming platforms do not provide.  Through EVEN, artists receive prompt payouts that far exceed the pennies paid by the larger platforms, direct fan relationships, and importantly, retain ownership of their own fan data (including fan contact information and purchase histories), which the larger platforms do not provide and purport to own.  EVEN's internet-based operations are not limited to any particular jurisdiction, and as a result, EVEN has or has had interests, customers, and business relationships in the State of Maryland.

15.     Plaintiff Rodriguez is the founder and CEO of EVEN Labs Inc.  Rodriguez worked in the music industry for a number of years prior to creating EVEN Labs and recognized that in the era of music streaming platforms and virtual releases, there was a need for artists to have a method of profiting from their music and connecting with their fans in a better way than other streaming and subscription-based services.

16.     EVEN has grown rapidly and significantly since the launch of its platform www.even.biz in 2023 and is constantly seeking new opportunities to partner with artists, music labels, and distributors.

17.     EVEN works with artists around the world; within the United States, the EVEN platform is involved with making artists' works available to the public through interstate commerce.

18.     EVEN operates through its domain name Even.biz and has a federal trademark Registration No. 98927229 for the word "EVEN," consisting of the stylized word "EVEN" in bold,

uppercase letters. The letters are evenly spaced. The federal registration covers "software as a service (SAAS) services featuring software for artists and content creators to distribute music, manage fan engagement, analyze audience data, and sell digital content directly to fans." EVEN's logo is often used in either red or black colors, although the registration is not limited to a specific color or font.

19.       To facilitate its growth and continue performing services that benefit fans and artists in the music industry, EVEN is in the process of actively seeking additional funding from investors.

20.       EVEN owns and maintains trade secrets within the meaning of 18 U.S.C § 1839(3) consisting of nonpublic business information, including investor, business partner and customer email addresses, proprietary business models and algorithms, draft investor presentations not meant to be shared outside of EVEN, and other proprietary information that derives independent economic value from not being known or readily ascertainable by proper means.

21.       EVEN has taken reasonable measures to maintain the secrecy of this information in the ordinary course of business, and at all relevant times, access to this information is conditioned upon obligations of confidentiality. EVEN has never authorized the public disclosure of this proprietary information by any of its independent contractors or employees.

**B.  Defendant Had Been Associated with EVEN as an Independent Contractor and Had Access to EVEN's Confidential Information and Trade Secrets.**

22.       In April 2023, Washington was first hired as a W-2 employee at EVEN to perform services relating to business development.

23.       In March 2024, Washington terminated his W-2 employment with EVEN, claiming he was interested in pursuing other consulting work with artists and not working full time exclusively for EVEN. Soon thereafter, EVEN and Washington entered into an independent contractor arrangement pursuant to a written agreement that was initially scheduled to last for three months, but which was extended by mutual consent through the end of September 2024.

24.    On October 7, 2024, Defendant and EVEN entered into a new consulting agreement (the "October Agreement"), which the parties operated under until the date of Defendant's termination on September 4, 2025.

25.    Under the terms of the October Agreement, Defendant had an obligation to maintain all EVEN documents and conduct all business activities such that they were accessible to the team at EVEN, an obligation which, as described below, Washington failed to uphold and ultimately led, in part, to his termination for cause.

26.    As part of performing his responsibilities as an independent contractor, Washington received a cell phone and laptop that EVEN had obtained for him and had access to EVEN's back-end servers and databases.

27.    Although Washington's permissions and access to EVEN's servers, email, and administrative tools were revoked upon his termination, the cell phone and laptop contain and continue to provide access to data and records exported from computer servers and databases storing EVEN's proprietary information.  After conducting an audit of EVEN's HubSpot account, the EVEN Plaintiffs identified at least seven (7) occasions on which Washington exported data containing records involving EVEN's contacts, deals, and companies.

28.    EVEN has also identified through HubSpot instances of Washington exporting Rodriguez's communications.   Those communications were later posted to Washington's pseudonymous social media accounts and attached to the Defamatory Emails.

29.    Through the devices, Washington has continued to have access to sensitive and confidential information, including all email addresses associated with EVEN's business associates, prospective business partners, investors, artists, customers and others who interacted with the EVEN platform.

### C.  The New York Lawsuit and Washington's Termination as EVEN's Independent Contractor for Cause

30.     On October 30, 2024, Washington was added as a defendant in a lawsuit previously filed against the EVEN Plaintiffs by a record label named Babygrande Global ("Babygrande"), in which Babygrande alleges copyright and trademark infringement (the "Copyright Lawsuit").

31.     The claims in the Copyright Lawsuit stem from the streaming of the works of an artist named Aaron Scott, p/k/a/ "Stove God Cooks" who Defendant Washington had introduced to the EVEN platform.

32.     The EVEN Defendants denied and continue to deny all material allegations in the Copyright Lawsuit, and the lawsuit remains pending.

33.     While conducting a standard discovery collection exercise in July 2025 in connection with the Copyright Lawsuit, an EVEN employee discovered that Washington's EVEN email account was missing communications prior to April 2025.

34.     At the time of EVEN's discovery of Washington's missing emails, Washington was representing himself in the Copyright Lawsuit "pro se."

35.     Upon discovery of the missing emails, trial counsel for the EVEN Plaintiffs first requested an explanation from Washington about the missing emails, as he was still engaged as an independent contractor by EVEN at that time pursuant to the October 2024 Agreement.   When Washington failed to respond, EVEN's counsel demanded that Washington return his company-issued phone and company-issued laptop, which would permit EVEN to conduct a forensic investigation with the goal of recovering the deleted emails.

36.     EVEN's counsel made numerous attempts to reach Washington to facilitate the return of the Stolen EVEN Devices, by email and by phone calls made on August 4, 5, 7, 18, and 26, 2025.

37.     Washington did not respond to EVEN's attempts to recover the Stolen EVEN Devices.

38.     Washington then retained legal counsel who entered an appearance to represent him in the Copyright Lawsuit on August 27, 2025.

39.     On that day, as Washington was now represented, counsel for the EVEN Plaintiffs attempted to contact Washington's counsel to schedule a meet and confer to discuss Washington's lack of response and address the issues raised in prior emails to Washington, including the return of the two Stolen EVEN Devices.  After several additional attempts with no response, counsel for the EVEN Plaintiffs followed up once again with Washington's counsel on September 3, 2025, informing him that if there continued to be no response or cooperation, the EVEN Plaintiffs would have no choice but to take further action and terminate Washington's business relationship with EVEN for cause.

40.     Washington still did not respond (individually or through his counsel), and as a result, EVEN terminated Washington for cause on September 4, 2025 citing, among other reasons, his deliberate breach of his October 2024 consulting agreement with EVEN and refusal to return the Stolen EVEN Devices.

41.     EVEN was within its rights to terminate Washington's contractor status for cause for refusing to return his work devices upon request.

42.     Despite multiple orders from the Court in the Copyright Lawsuit to meet and confer, EVEN's property has not been returned.  Washington was most recently ordered to appear before the Court on February 25, 2026 to produce the Stolen EVEN Devices, but he failed to appear, and is now subject to an Order To Show Cause issued by the Court as to why he should not be sanctioned in the Copyright Lawsuit.

43.     The Stolen EVEN Devices were never Washington's personal property as they were purchased by EVEN for his business use and he was obliged to return the devices upon request.

44.     Instead of complying with Court Orders, Washington continues to spend his time on his malicious and defamatory misinformation campaign against EVEN and Rodriguez.

45.     Washington has used EVEN's confidential and proprietary information to concoct false and defamatory statements regarding the EVEN Plaintiffs.

**D. Washington's Defamatory Actions and Misappropriation of Trade Secrets Following Termination Enabled by the Stolen EVEN Devices.**

46.     Shortly after his termination on September 4, 2025, Washington began sending email messages to EVEN's current and prospective business partners, members of the music industry, and technology industry and press, and other recipients important to EVEN's ongoing business interests.

47.     Beginning in September 2025, Washington, through a pseudonymous email address "No NDA Network" (nondanetwork@proton.me), has sent, and continues to send, defamatory and harassing emails (the "Defamatory Emails") to a significant number of EVEN's business partners, prospective business partners, investors and potential investors, press for the music industry, and other members of the public.

48.     EVEN's website domain is "www.EVEN.biz."

49.     The Defamatory Emails falsely accuse EVEN of fraud and theft and include a link to a website Washington created on September 6, 2025 (two days after his termination) under the confusingly similar domain www.evenbiz.biz (the "Defamatory ".biz" Website").

50.     The Defamatory ".biz" Website includes further false accusations of fraud as well as exposing some of EVEN's proprietary business information and confidential business communications, including some *draft* slides that were not finalized, never intended to be sent to

investors, and ***never sent to investors*** or anyone outside of EVEN.

51.    The Defamatory ".biz" Website reiterates the false statements made in the Defamatory Emails and deliberately posts distorted versions of EVEN's confidential and proprietary data and documents.

52.    The Defamatory Emails falsely state that the EVEN Plaintiffs are committing various illegal activities including, among others, securities fraud, embezzlement, and wire fraud.

53.    The Defamatory Emails falsely state that the EVEN Plaintiffs are actively misleading investors, falsifying records, engaging in general corporate misconduct, and are betraying the very artists the EVEN Plaintiffs seek to protect and promote.

54.    Each of the Defamatory Emails direct readers to the one of two websites, either evenbiz.biz or magrodriguezfraud.com (together, the "Defamatory Websites").

55.    Through filing a Uniform Rapid Suspension System ("URS") Complaint with the Internet Corporation for Assigned Names and Numbers ("ICANN"), the EVEN Plaintiffs were able to get the host of evenbiz.biz to take down Washington's Defamatory ".biz" Website. However, like a game of whack-a-mole, Washington has since reposted the very same content under a different domain, namely "magrodriguezfraud.com" (the "Defamatory "fraud" Website").

56.    Plaintiff was also able to identify additional pseudonyms used by Washington, "Rorschach," "Rorschachs.Eyes", and "Walter Kovacs" which Washington used to hide his identity while registering the domain for evenbiz.biz and that Washington repeatedly uses to post on social media accounts.

57.    Specifically, Washington used Walter Kovacs as the name behind the registration of the Defamatory ".biz" Website and rorschachs.eyes@gmail.com as the associated email for its registration.  The EVEN Plaintiffs informed the examiner in that dispute that "Walter Kovacs" is

not a real person and that Washington was using the name to operate under a fictional alias of a comic book character from the "Watchmen" series of the DC Universe who also goes by "Rorschach."   This character is known as a vigilante who operates in disregard of the law.

58.    The "Rorchasch" and "Walter Kovacs" pseudonyms are used in addition to Washington's more prominent use of the "No NDA Network" X account (@NoNDANetwork) which on information and belief was created by Washington in July 2025.

59.    As a result of the URS Complaint filed by the EVEN Plaintiff, the evenbiz.biz website was taken down by the domain host.

60.    The Rorschach pseudonym operates the email address Rorschach.eyes@gmail.com, the Disqus account @disqus_3lIBkSVIAZ with the username "Walter Kovacs," a Scribid account under the username "Rorschach," and a reddit account under the username "mrwalterkovacs" all of which have been used to harass the EVEN Plaintiffs and EVEN's employees and post defamatory statements.

61.    The Disqus account is directly linked to Washington as it only has a total of two posted comments: one comment made eight years ago that directs people to Washington's blog "House of Omen" and a second comment that falsely states that EVEN is committing fraud.

62.    Although they are "anonymous," EVEN recognizes that Washington is the person behind both the "No NDA Network" emails, the "Evenbiz.biz" website, the Walter Kovacs and Rorschach pseudonyms, the taken down evenbiz.biz website, and the "magrodriguezfraud.com" website because, among other things, what all of the documents on the Defamatory Websites have in common is that **only** Washington received and had access to all of the documents during his time as a contractor with EVEN, and which he unlawfully continues to access through the Stolen EVEN Devices after his termination.

63.     Beginning October 7, 2025, Washington left his efforts at anonymity aside, and began making a series of brazen defamatory, harassing, and threatening statements on his personal X account (formerly Twitter), under the known username "DDOTOmen," as described in detail below.

64.     Beginning on October 7, 2025, Washington also began making defamatory statements on his personal Instagram and Bluesky account, also under the known username "DDOTOmen," as described in detail below.

65.     Defendant has also refused to return the Stolen EVEN Devices, consisting of a cell phone which was purchased for Washington during his time as a W-2 employee and a laptop which EVEN allowed him to use while he was a consultant, and which conferred access to EVEN's confidential and sensitive business information.

66.     The Defamatory Emails were all sent to email addresses maintained as confidential and proprietary information and accessible on devices connected to EVEN's email servers, including the Stolen EVEN Devices that Washington refuses to return.

67.     The Defamatory Websites contain confidential and proprietary EVEN business documents and communications that Washington uploaded from the Stolen EVEN Devices.  In many cases, documents and communications appearing on the Defamatory Websites have been altered to portray EVEN in a false light.

68.     The Defamatory Websites repeat many of the false statements made in the Defamatory Emails, and further deliberately and maliciously distort information Washington had access to during his time as a contractor with EVEN.

69.     Washington unlawfully continues to access EVEN's confidential and proprietary information using the Stolen EVEN Devices.

70.     On or about September 16, 2025, Plaintiff Rodriguez began receiving emails, calls, and text messages from former, current, and prospective business partners and other professionals in the music industry and music and technology journalists notifying him that they had received unsolicited emails from nondanetwork@proton.me, falsely accusing the EVEN Plaintiffs of securities fraud and containing a link to the Defamatory "evenbiz.biz" Website.

71.     Attached hereto as **Exhibit 1** is one example of an email dated September 16, 2025 sent by Washington to one of EVEN's business partners, which the business partner forwarded to Rodriguez.  The email contains in relevant part the following false statements:

> You are receiving this message as it has come to our attention that you may be conducting business with Even.biz.

> We have evidence and good faith belief that Even is inflating its database with fraudulent account profiles of artists that are signed to labels within *[a major record label]* without authorization from the respective labels or permission from the artists or their representatives.

> Our independent investigation has concluded that the intended purpose of these deceptive practices are to secure financing from private equity firms and partnership deals with major music groups.

> Enrique 'Mag' Rodriguez, the founder and CEO of the company is directly involved behind the fraud.

> Based on information and documentation we have obtained, Rodriguez and Even have engaged in deceptive practices such as providing investors with misinformation that grossly misrepresents the companies health, in addition to falsely claiming to already have partnership agreements with with *[sic]* the likes of *[major record labels]* and has been doing so since about November 2023.

> Our evidence also finds that Rodriguez and EVEN colluded with a third party platform called "Matchfy.io" and has continued to receive thousands of unauthorized artist accounts to its database.

> This fraudulent scheme has been ongoing since about January 2025 through now. As of today, there are an estimated over 50,000 fraudulent unauthorized accounts of artists from record labels that are not aware of this activity, including *[a record label]*.

> Our most recent evidence suggests that Mag Rodriguez has been committing securities fraud by circulating documents to potential investors that purposely misrepresent having partnerships with The Orchard and other music groups.

(Brackets and italics added as actual record label names have been omitted for privacy concerns). None of those statements are true.

72. **Exhibit 1**, as with all the Defamatory Emails, is entirely false, and is intended to deceive EVEN's current and prospective business partners.

73. As a former contractor with deep knowledge of EVEN's business model, Washington knew that the statements made in the Defamatory Emails were false.

### E. The Content of the Defamatory Emails Prove that Washington Has Been Misappropriating and Misrepresenting EVEN's Confidential and Proprietary Information since his Termination.

74. In particular, the Defamatory Emails falsely claim that EVEN was "inflating its database with fraudulent account profiles of artists that are signed to labels . . . without authorization from the respective labels or permission from the artists or their representatives."

75. That is false, and knowingly misstates how EVEN categorizes and displays the profiles of artists ("Artist Profiles") on its platform and in its investor presentations.

76. In its presentations to prospective investors, EVEN clearly differentiates between the different types of artist status on the EVEN platform: "onboarded," "claimed," and "activated." (*See* **Exhibit 2**, showing in the left hand column that in its presentations EVEN differentiates between onboarded, claimed, and activated Artist Profiles, with the numbers redacted to protect EVEN's trade secret information).

77. When a label or distributor invites an artist to join the EVEN platform, it is called "onboarding," but the artist needs to "claim" their profile before they can launch any music on the platform. The existence of unclaimed non-public Artist Profiles is a core feature of EVEN's

business.  Music labels, distributors, publishers, artists, and "DIY Platforms" who partner with EVEN use EVEN's application programming interface ("API") to create the Artist Profiles as part of those partnerships.  Once an Artist Profile is created with the permission of the music label, distributor, or artist, it remains confidential until the artist is invited, usually through their label or distributor, to join EVEN.  At that point, they can choose to claim their Artist Profile (a "claimed profile") and can then post offerings to their fan base through EVEN's platform, or they can choose not to claim their profile and not use the platform.  Since the beginning of 2025, the artist or their authorized representative must claim the Artist Profile as a necessary precondition to the Artist Profile becoming public.  After an account is claimed, an artist can then release music for temporary streaming or place items for sale on the EVEN platform, and is only then considered an "Active Account."

78.    Although some artists may claim their Artist Profiles at the inception of the profile being created at the instance of the label or distributor, sometimes artists may claim the profile a significant period of time after their initial invitation to join the EVEN platform depending on such factors as the artist's release schedule and preferences, and some artists never claim their profiles to become an Active Account.  Accordingly, it is important to EVEN's partners to have the Artist Profiles ready and waiting for the artists to decide to claim them and then issue a release promptly.

79.    All unclaimed Artist Profiles currently exist only on the private ***back-end*** of EVEN's server, with the full knowledge of the labels or distributors who requested the creation of the Artist Profiles.  EVEN does not include unclaimed profiles in its count of Active Accounts on the platform when it publicly discloses those numbers.

80.    Washington had direct knowledge of EVEN's above-board onboarding process, yet Washington falsely labelled onboarding as "fraud" in the Defamatory Emails and on the

Defamatory Websites.  Washington is aware of the distinction between Artist Profiles that are not claimed, on the one hand, and Artist Profiles that are Active Accounts, on the other hand, and therefore his claim of "fraud" in the onboarding numbers that EVEN report is false.  Additionally, Washington only had knowledge of the confidential and proprietary information relating to unclaimed Artist Profiles stored on the back-end of EVEN's server because of his time as an EVEN independent contractor.    Washington  intentionally  spread  false  information  through  the Defamatory Emails and the Defamatory Websites to falsely imply that EVEN is inflating the number of artists using its platform for purposes of securing investors.

81.    Washington's continued access to information concerning the scope and content of the Artist Profiles by virtue of his possession of the Stolen EVEN Devices represents a continued threat to EVEN's business, and his malicious misrepresentations about the purpose of the unclaimed Artist Profiles has damaged and will continue to damage EVEN unless and until Washington is ordered to stop spreading such false and defamatory misinformation.

82.    For example, on February 4, 2026, knowing that representatives of EVEN would be attending various events during Grammy Week in Los Angeles, Washington, again through the email address nonndanetwork@proton.me, sent another mass email to attendees of the Grammy Awards and the representatives of award winners and nominees with the subject line "A List of Grammy Winners & Nominees Mag Rodriguez & EVEN.biz Are Infringing."  (*See* **Exhibit 50**). The email attaches fifteen (15) screenshots of images purporting to show unauthorized Artist Profiles on EVEN's platform for major artists including Sabrina Carpenter, SZA, Bad Bunny, Tyler The Creator, The Weeknd, Karol G, Ariana Grande, Pharrell Williams, Stevie Wonder, and more.  In fact, these were non-public mock-ups created for internal purposes that were never on EVEN's consumer-facing platform and EVEN never told anyone they were claimed profiles or

Active Accounts.  Washington had access to these mock-ups while he was an independent contractor at EVEN, and knows that they were not public-facing.  Thus his claims of fraud in the February 4th email were also false.

83.    The February 4th email includes defamatory statements that Plaintiffs violated the name, image, and likeness of artists by creating unauthorized profiles on the EVEN platform, and used "inflated metrics" to raise $10 million from investors.

84.    Turning back to the September 16, 2025 Defamatory Email (**Exhibit 1**), Washington is also aware that his statements concerning Matchfy.io ("Matchfy") in the Defamatory Emails are false.

85.    Matchfy is a music promotions platform that focuses on artist-managed promotion through AI and other tools.

86.    Matchfy's partnership with EVEN began in February 2024.  During that partnership, which Washington initiated, Matchfy onboarded 42,000 artists using EVEN's API.  As described above, this means that 42,000 Artist Profiles were created to serve the entire database of artists then available to Matchfy, and that Matchfy could invite each of those artists to claim, at a later time, public access to the Artist Profile on the EVEN platform.

87.    EVEN terminated its relationship with Matchfy in April 2024.  However, per the terms of the agreement between EVEN and Matchfy, those 42,000 Artist Profiles still exist on EVEN's back-end server and are still available for the artists to claim if they wish to do so.

88.    As of the date of this Complaint, approximately 1,500 Matchfy artists have claimed their Artist Profiles on EVEN's platform and *only* those 1,500 Artist Profiles are public for users to view.

89.    Washington's knowledge of any unclaimed Matchfy Artist Profiles is solely by

virtue of his past access to such information when he was an independent contractor. His wanton misrepresentation of the onboarded but not claimed Artist Profiles has caused and will continue to cause EVEN reputational harm.

90.    Prior to his termination, Washington accessed EVEN's email server that contains email addresses and contact information for all of EVEN's business partners and potential partners, as well as investors and prospective investors, and Washington downloaded that information even though he was not authorized to do so.

91.    On October 6, 2025, another EVEN business partner forwarded Rodriguez a somewhat different Defamatory Email from nondanetwork@proton.me, including *draft* EVEN slides, some of which were never sent outside of EVEN and not intended for use. (*See* **Exhibit 3**).

92.    The October 6, 2025 Defamatory Email contains false and defamatory statements, and falsely accuses the EVEN Plaintiffs of "embezzlement and wire fraud, where 'Mag Rodriguez' sought to misappropriate funds with the intent of stealing from an artist."

93.    This statement is false. It references an incident where EVEN had arranged for one of the artists with an Active Account on its platform to receive a fee for making an appearance at a conference in London. Washington negotiated with a third party for the artist to be paid $10,000 and for EVEN to be reimbursed for its travel expenses in the amount of $5,000. But the event organizer was having difficulty paying the artist because there was a currency mismatch in their respective accounts, and Rodriguez offered to assist by making the payment to the artist directly via Stripe set up on the artist's EVEN account . Neither Rodriguez nor EVEN have ever diverted a payment meant for an artist to themselves.

94.    As further evidence of Washington's continued access to EVEN's trade secret

information, the Defamatory Email at Exhibit 3 contains confidential and proprietary ***draft*** slides that Washington had access to during his time as a contractor at EVEN. The slides list partners that EVEN had not announced yet or who EVEN was still in negotiations with about partnerships. Some of these slides have not been made public or presented to investors or anyone else in the industry, despite the false allegation in Washington's communications that such slides were used to seek investment. Disclosure of these slides threatens EVEN's reputation and EVEN's relationship with not only these partners but potential future partners as well.

95.    The exact scope and extent of information Washington may have downloaded and retained from EVEN's servers unlawfully, whether on the Stolen EVEN Devices or that he may have stored elsewhere, is unknown. For this reason, it is particularly important that Washington be enjoined from further harmful statements and communications, and that the Stolen EVEN Devices, to the extent not already ordered, be returned to EVEN for safeguarding and forensic analysis.

96.    The Defamatory Email at Exhibit 3 betrays Washington's awareness of the falsity of his claims, and his intent to cause harm to EVEN, by his self-serving concluding statement:

> Please note that this transmission is in no way shape or form motivated by malice but to simply inform those that could be impacted. We are not a law enforcement agency nor adversaries of "Mag Rodriguez" and Even.biz and have not been incentivized by any gain (financial or otherwise) to disseminate this information.

That statement is obviously false; Washington is clearly acting with malice to harm the EVEN Plaintiffs' reputation and business.

97.    Indeed, EVEN has recently learned in the Copyright Lawsuit that Washington tried to assist the Plaintiff Babygrande in that case to extort EVEN by offering to disclose confidential EVEN information to Babygrande's CEO in exchange for Babygrande dismissing Washington from the case and other compensatory benefits, as described more fully below.

98.     Despite several inquiries made to Washington's counsel in the Copyright Lawsuit, the Defamatory Emails continued unabated.  On October 7, 2025, members of the music industry forwarded emails to Rodriguez, originally sent from the nondanetwork@proton.me email account, bearing the subject line "Even.biz Suspected Investor Fraud / SEC Violations."  **(Exhibits 4, 5).**

99.     As described further below, Washington continued to send mass emails to EVEN's business contacts on October 21, 2025, January 22, 2026, January 27, 2026, and February 4, 2026.

100.     The recent Defamatory Emails demonstrate Washington's increasing desire to contact as many EVEN business partners, potential business partners, investors, potential investors, and other stakeholders as possible, spreading information known to be false, further demonstrating the malice behind Washington's intentionally harmful actions.  In those emails, Washington also attacks several artists who release their work on EVEN's platform in an effort to punish those who do work with EVEN by attacking them publicly.

101.     Some recipients of the Defamatory Emails have raised concerns about Washington's defamatory statements causing EVEN to expend significant time, resources and legal fees to assure its constituencies that these statements are false.

**F.  The Defamatory Websites Demonstrate Washington's Malicious Intent to Cause Confusion and Spread False Information to Harm EVEN.**

102.     Most, if not all, of the Defamatory Emails contain a link to one of the Defamatory Websites.

103.     As stated above, the Defamatory ".biz" Website was created two days after Washington's termination from EVEN.  The domain name is www.evenbiz.biz, which is confusingly similar to EVEN's website, www.even.biz, a similarity calculated to confuse recipients into thinking that information on the Defamatory ".biz" Website originates from a verified source.

104.    The Defamatory Websites also use EVEN's trademarked logo (or substantially similar variations of it), in a further attempt to make it look like the false websites are sponsored by or associated with EVEN.

105.    The Defamatory "fraud" Website uses Rodriguez's real name to permanently associate his name with fraud.

106.    The Defamatory Websites make false statements about Rodriguez's honesty and trustworthiness, and include misleading and doctored screenshots from the back-end of EVEN's website.

107.    Citing verses from the Bible, the Defamatory Websites falsely accuse the EVEN Plaintiffs of dishonesty (Exodus 23:1), deceit, (Matthew 7:15), and stealing (8th Commandment).

108.    Washington is the creator of the Defamatory Websites and is responsible for all the information placed therein.

109.    The Defamatory Websites contain documents that all have in common the fact that *only* Washington had access to or received each of them.  These include:

> (a) Back-end confidential and proprietary screenshots from EVEN's website accompanied by false and misleading statements, including a screenshot of what Washington falsely claims to be the number of artist accounts on EVEN's platform with the accompanying text "80,000 ARTISTS? YOU SURE" and "WHERE DEY AT DOE?" (**Exhibit 6).** These statements falsely implying that EVEN misrepresents the number of artists on its platform. These posts appear within the Exodus: 23:1 folder implying falsity based on the meaning of that verse.
>
> (b) False statements about the EVEN Plaintiffs' ethics and loyalty to music artists on its platform.  (**Exhibit 7)**.  Text present on the Defamatory Websites reads "DON'T STEAL THE $$$ FROM THE ARTIST."  Its presence demarcated as belonging to the 8th Commandment (with a previous version of the website invoking the 7th Commandment) folder insinuates that the EVEN Plaintiffs committed theft (or adultery) against the very music artists they seek to protect.
>
> (c) Partial and misleading screenshots of confidential communications in which Washington is the only common party.  (**Exhibit 8).**  These

conversations were doctored to make the false claim that EVEN does not have partnerships with large music labels.  The full unedited email (**Exhibit 9**) reveals instead that the record label says that although it was not the right time for a "transversal deal," it would be moving forward with onboarding a selection of its artists to EVEN's platform.

(d) A misleading video of Rodriguez that was recorded without his knowledge during a confidential and proprietary internal EVEN team video call attended by Washington, in which Washington edited the video into a loop to suggest falsely that Rodriguez is dishonest.

110.    One of the screenshots displayed on the Defamatory Websites, taken from the back-end of EVEN's website, was provided by a current EVEN employee to Washington at his request on August 22, 2025, prior to his termination.  The employee believed at the time that the document was being used in the ordinary course of business.

111.    In summary, just as with the Defamatory Emails, all of the information on the Defamatory Websites is false or misleading.

### G. Washington Has Used His Personal Social Media Accounts to Defame EVEN and Further Spread Misinformation.

112.    Since at least October 2008, Washington has maintained a social media account on X (formerly Twitter) using the username "@DDotOmen" as well as social media accounts on Instagram and Bluesky under the same username or "handle."

113.    The similarity in content and style between the "anonymous" and "pseudonymous" social media postings of No NDA Network, Rorschach, and Walter Kovacs cannot be overlooked when viewing Washington's personal X account posts.

114.    On October 7, 2025, no longer hiding behind his pseudonyms, Washington began making openly defamatory, incendiary, and threatening statements about the EVEN Plaintiffs through the "@DDotOmen" social media accounts.  True and correct copies of Washington's October 7, 2025 posts on X are attached hereto as **Exhibit 10** through **Exhibit 15.**

115.    On October 7, 2025, at 2:18 PM, Washington posted on X: "LeBron ain't the only one making an announcement today.  I need everyone to tap in as I expose this corrupt industry again.  Follow me on IG @ddotomen and Bluesky. https://t.co/ezJXPhgK3z."  The link included in the quoted text connects to Washington's account on Bluesky. (*See* **Exhibit. 10**).

116.    Two minutes later, Washington posted from his X account an obscured video of EVEN's trademarked logo with the accompanying text: "You picked the wrong one to play with and now there is nothing that will stop me from exposing you." (*See* **Exhibit 11**).

117.    Tagging news outlets is a commonly known way on social media to try to gather interest and expand a post's reach by soliciting the tagged accounts to publish a story about the content of the post.  To garner attention from news and media outlets, Washington posted his incendiary and false statements about the EVEN Plaintiffs again from his X account tagging the following accounts: "@Variety @THR @billboard @mimitheblogger @thejasminebrand @shirleyhalperin @MusicWeek @musicbizworld."  **(***See* **Exhibit 11).**   These are all influential music industry publications or social media influencers.

118.    By tagging news outlets, Washington is deliberately attempting to interfere with the EVEN Plaintiffs' current and prospective business relationships and force EVEN to spend time and expenses to prove Washington's statements are false.

119.    Upon information and belief, Washington intends to generate false and unjustified public scorn and contempt for the EVEN Plaintiffs that will prevent individuals, artists, and business from associating or dealing with the EVEN Plaintiffs.

120.    At 3:02 PM on October 7, 2025, Washington continued to publicly threaten the EVEN Plaintiffs on his X account while falsely claiming that his statements were true, posting: "Just know you lost this battle before it EVEN started but I'm going to dismantle you piece by

piece. I'm going to stand on truth, stand on business and stand on your neck. Alhamdulilah. @/magisformagic @/even_biz."   (*See* **Exhibit 12)**.   Notably, "magisformagic" is Rodriguez's own social media "handle."

121.     At 3:38 PM on October 7, 2025, Washington posted from his X account a screenshot of Rodriguez's X account (which is in private mode and thus not generally accessible) with the following text: "Hiding like a coward but the truth will ALWAYS follow you and find you. You're a degenerate, a swindler and a scumbag of the highest order." (*See* **Exhibit 13**).

122.     At 4:27 PM on October 7, 2025, Washington posted, "Here's a valuable lesson on why it pays to be a solid person and rooted in community. You're a scoundrel. You're a man without a country who exploits his own people and Black people to be validated by the wealthy caucasians. @/magisformagic." **(***See* **Exhibit 14**).

123.     At 6:03PM on October 7, 2025, Washington posted: "I AIN'T GONNA TELL NOBODY YOU BEING INVESTIGATED I AIN'T GONNA TELL NOBODY ABOUT YOUR FRAUDULENCE @even_biz @magisformagic." (*See* **Exhibit 15**).   Washington includes direct tags to the EVEN Plaintiffs' X accounts and false statements that the EVEN Plaintiffs are being investigated for fraud, in effort to have visitors to EVEN's accounts redirected to Washington's false and incendiary posts.

124.     Washington knew that the statements made in each of his posts were false.

125.     The social media posts continued to escalate into the next day.  On October 8, 2025, at 2:02 AM, Washington posted a threat to the wellbeing of Rodriguez (account @magisformagic) on his X account.   (*See* **Exhibit 16**).   Reposting a Variety article about Dolly Parton's failing health, Washington adding the ominous text: "Please God spare Dolly. Take @magisformagic instead."

126.    The October 8, 2025 post at Exhibit 16 is a clear threat to Rodriguez's personal health and safety.

127.    At 7:27 PM on October 8, 2025, Washington posted to X: "I wrote this 3 months ago and initially wasn't going to publish for the sake of civility. However I refuse to keep the peace at the expense of my own. Although I planted seeds in a desolate garden I find comfort that rotten fruit falls off on its own. Your move @magisformagic" (*See* **Exhibit 17**) including screenshots of a post from Instagram made earlier the same day.  (*See* **Exhibit 18**).  Both the post on X and the post on Instagram contain a slide with the word "LEAVIN'" stylized to mimic the distinct font and color scheme of EVEN's trademarked logo.

128.    The October 8th Instagram post (*See* **Exhibit 19**) also tags multiple news outlets and artists in the slides themselves (*See* **Exhibit 20**) and was published as an "Instagram Collab" post with Industry Blackout (@industryblackout), an unverified account which on information and belief is also run by Washington, as an attempt to legitimize his false claims.  (*See* **Exhibit 19**). And while Washington continues to make false and defamatory statements about the EVEN Plaintiffs by accusing them of "chaotic, parasitic, manipulative, toxic, desperate and brazenly unethical actions," the overall tone of his message seeks to garner sympathy, including by falsely stating that he walked away from EVEN, rather than honestly admitting he was terminated for cause for his refusal to return the Stolen EVEN Devices and other acts of insubordination.

129.    The October 8th Instagram post contains EVEN's proprietary and confidential trade secrets and private slack communications from Washington's time as a contractor at EVEN.  The documents shared in the post can also be found on the Defamatory Websites, further solidifying the link between Washington and No NDA Network.

130.    In continuing misuse of EVEN's proprietary and confidential information, Washington sent a mass email from "ConnecteDDots MGMT" using the email address, info-

connecteddotsmgmt.com@shared1.ccsend.com. The email sent the content from Washington's October 8th Instagram post to EVEN's employees and business partners and informed them that he was leaving the company. (*See* **Exhibit 21** October 21, 2025 mass email from Washington to EVEN's staff and **Exhibit 22**, November 27, 2025 email from Washington to EVEN's investors and partners).

131.    Washington's Instagram post and email are a deliberate tactic to gain traction for his other unsympathetic social media posts where he lies and threatens the EVEN Plaintiffs by falsely claiming that he suffered from "mistreatment, plus mental and emotional trauma in return."

132.    These posts serve as further manipulation of the truth in an attempt to mislead third parties into believing his false narrative .

133.    Like Washington's posts on X, Washington's Instagram post tags multiple news outlets, including *Billboard*, *Rolling Stone*, and *Variety* in an attempt to disrupt EVEN's business and discourage individuals from associating with the EVEN Plaintiffs.

134.    Washington also utilizes cross-platform posting to increase the reach of his defamatory statements.  Washington reposts screenshots of his X posts on Instagram and Bluesky. (*See* examples, at **Exhibit 23** and **Exhibit 24,** respectively.)

135.    Washington has also fed his false statements to third party Instagram accounts under the false narrative that he is leaking "true" information about EVEN.  This has led to multiple republications of Washington's defamatory statements. In turn, Washington has caused those third parties to post their own defamatory statements.  (*See* **Exhibit 25**, an October 8, 2025 post from the Instagram account @414unlocked reposting content from the Defamatory ".biz" Website).

136.    On October 9, 2025 Washington commented on a post using his X account, stating: "You hear that @magisformagic??? FALSE STATISTICS VS REAL DATA. HOW MANY ARTISTS DOES @even_biz REALLY HAVE??" (*See* **Exhibit 26**).

137.    On October 10, 2025, Washington posted a direct threat to Rodriguez from his X account. The post quoted "Real Housewives of Potomac star Dr. Wendy Osefo being booked on criminal fraud charges, TMZ reports" adding the direct text message: "You're next @magisformagic." (*See* **Exhibit 27**).

138.    The October 10, 2025 post is a direct threat to Rodriguez that he will face criminal charges, all the while, Washington knows that the statements of fraud he is publicizing are completely false.

139.    On October 10, 2025, Washington published a post on Instagram containing two minutes and forty seconds of "original audio" playing over a photograph of a building's exterior with the text "MEET THE MAG."  (*See* **Exhibit 28**).  Washington tagged fifteen (15) different news organizations and music-focused content creators in this post.  (*See* **Exhibit 29**).  The original audio contains a song with further defamatory statements and multiple threats to the well-being and safety of Rodriguez and his family.  The entirety of the "song" is a highly personal, deeply offensive attack directed at Rodriguez and his family and contains disturbing lyrics.  (*See* **Exhibit 30** for entire lyrics).

140.    Washington's repeated threats of physical violence against Rodriguez, Rodriguez's family, and the employees at EVEN are ongoing and warrant intervention from the Court.

141.    For example, at 00:42 seconds, Washington says: "I'mma break EVEN apart, divide it and split it up.  Share a piece with your causalities and the other half is for Chuck.". "Chuck" is a reference to the owner of Babygrande, the plaintiff in the New York Copyright Lawsuit, Chuck Wilson.

142.    At 1:17 seconds, Washington says: "This is just a warning shot suggest you go get a gun."

143.    At 2:34 seconds, Washington says: "I want your heart, I want your blood, I want everything you love.  If you ever plan on stopping me then tell it to the judge."  This lyric was written and posted as a direct threat to Rodriguez's wife.[1]

144.    Washington further posted the lyrics on the website genius.com, where he includes links referring back to his own social media posts as well as the Defamatory ".biz" Website. (**Exhibit 30**).

145.    On October 13, 2025, Washington posted the song to his X account and released it for streaming on Spotify.  (*See* **Exhibits 31** and **32**, respectively).

146.    Washington continues to repost "Meet the Mag" on X and add new false claims about the EVEN Plaintiffs.  On November 24, 2025, he commented on an X post reposting his song and stating: "Working for a CEO that's a compulsive liar was hard so I typed up my resignation and dropped a diss track exposing the company."  (*See* **Exhibit 33**).

147.    Washington has continuously reposted and republished his own posts on a daily basis in order to keep them current and in an effort to reach the largest audience possible.

148.    Also beginning on October 7, 2025, Washington began leaving a series of false and defamatory comments on several YouTube videos of interviews Rodriguez had done.  Under a YouTube account created on October 1, 2025, "@STOPBELI-EVENMAGRODRIGUEZ," Washington links back to the Defamatory ".biz" Website with the caption "Learn the Truth about Mag Rodriguez."  (*See* **Exhibit 34**).  Additionally, from this account, Washington has posted comments on at least five different occasions stating: "Mag Rodriguez is a complete and total fraud" (*See* **Exhibit 35**), "Mag Rodriguez is a total fraud. Talk about your lawsuits and illegal practices" (*See* **Exhibit 36**), "Mag Rodriguez is a liar and a fraud" (*See* **Exhibit 37**), and "Mag

---

[1] Washington has made other attempts to harass Rodriguez's wife, including by calling her place of work and attempting to get her fired.

Rodriguez is a fraud do your homework."  (*See* **Exhibit 38**).  These comments were made in a direct attempt to increase traffic to the Defamatory ".biz" Website and further disseminate the false and harmful misinformation about Rodriguez and EVEN.

149.    Washington also took to Disqus under the pseudonym "Walter Kovacs" to post defamatory statements that EVEN was involved in fraud.  Specifically, when EVEN announced its new COO, Washington commented: "Is she going to do something about the fraud Even has been involved with?" (*See* **Exhibit 39**).  As stated above, the Disqus account using the username "Walter Kovacs" has direct links to Washington's personal blog going back over eight (8) years.

150.    Throughout the rest of October, Washington continued to make defamatory statements about Rodrigez on his X account.  On October 12, 2025, responding to one of his earlier posts, he stated: "That's because clowns like @magisformagic have made a lifestyle out of being a liar." (*See* **Exhibit 40**).

151.    On November 26, 2025, Washington made a failed attempt to file a complaint with the U.S. Equal Employment Opportunity Commission (the "EEOC Complaint") echoing the false statements that he had been publicizing for the past few months.

152.    That same day, Washington's EEOC Complaint was dismissed.

153.    EEOC complaints are not public record.  During the investigation phase, the agency is legally prohibited from disclosing details to the public.  This does not include the employer for which the complaint is against.  In other words, only Washington and the EVEN Plaintiffs were aware of the EEOC filing.  However, after the EEOC filing was initiated, Washington's "anonymous" email and social media accounts started to post information about the non-public documents.  These "anonymous" accounts therefore can be no one other than Washington.

154.    Shortly after Washington's EEOC claim was dismissed, he was ordered by the

Court in the Copyright Lawsuit to make both Stolen EVEN Devices available for imaging and to return the stolen laptop.  The December 2, 2025 Court Order specifically required Washington to produce the Stolen EVEN Devices, in person, at the federal courthouse.

155.    Under pressure from the December 2, 2025 Court Order, Washington reinvigorated his defamation campaign against EVEN.  It is clear from the timing of his actions, that Washington knew it was only a matter of time before his fraudulent acts would be uncovered.  Furthermore, he knew that once he produced the Stolen EVEN Devices his access to EVEN's confidential information would be cut off.

***Washington's Fabricated "Fight for His Life"***

156.    On December 2, 2025, Washington began soliciting funds via social media for the "fight for his life."  The fight in question references his role as named defendant in the Copyright Lawsuit.  (*See* **Exhibit 41**, Washington's December 2, 2025 Instagram post).

157.    Within his Instagram post, Washington pretends that he was wrongly named in the dispute despite clear evidence in the Copyright Lawsuit that Washington acted outside of the scope of his independent contractor agreement with EVEN in connection with the copyright infringement that is at the center of that lawsuit.  (*See* **Exhibit 42**, October 30, 2024 text from Washington stating that he wasn't a full-time employee and he was acting on behalf of the artist outside of his role at EVEN).

158.    Despite knowing his statements are false, Washington claims that EVEN mischaracterized him as a contractor and refused to indemnify him in the Copyright Lawsuit, neither of which is true.[2]

---

[2] EVEN offered to indemnify Washington to the extent he was acting within his role as a contractor for EVEN, but not for acts outside of that.

159.    Washington's December 2, 2025 Instagram post was jointly posted with the Instagram account "Industry Blackout," which on information and belief, is also run by Washington.

160.    Washington's GoFundMe page repeats the false and defamatory statements made towards EVEN, including false statements that his employment was misclassified and that he was terminated out of retaliation.   All these statements are false. (*See* **Exhibit 43**, Washington's GoFundMe page.).

161.    It has come to light through the Copyright Lawsuit that Washington spent hours colluding with the Plaintiff Babygrande, in the Copyright Lawsuit in an effort to injure EVEN's reputation and cause financial hardship for the company.

162.    In fact, in August 2025 while Washington was still a contractor at EVEN, and ignoring EVEN's requests for the return of the Stolen EVEN Devices, he made plans to assist Babygrande in extorting a large settlement from EVEN by accessing EVEN's proprietary information located on EVEN's internal servers and offering to Babygrande what he falsely characterized as information that would be damaging to EVEN with respect to an important business transaction that EVEN was at the final stages of negotiating.   Specifically, Washington claimed that if he provided the misappropriated information, Babygrande could use it to threaten to interfere with the transaction which Washington falsely claimed, "EVEN needs more than astronauts need oxygen in space."

163.    Washington offered to provide this information to the Babygrande in exchange for Babygrande dismissing Washington from the lawsuit and providing Washington with cash or a job.  (*See* **Exhibit 44**, Dkt. 208 in the Copyright Lawsuit)  The supposedly damaging information (which did not actually exist), had nothing to do with the merits of the Copyright Lawsuit.

164.    Washington made the proposal to Babygrande, so that Babygrande would use the false information to ruin business opportunities for EVEN and tarnish EVEN's reputation in the music industry.

***Defamatory Posts Continue in Late 2025 and Continue to the Present in 2026***

165.    Washington continued to threaten EVEN by attacking its partners.  In December of 2025, in retaliation against music artist Wale's partnership with EVEN, Washington posted a series of threatening, violent, and offensive posts about Wale.  These posts were made in a deliberate attempt to harass and threaten those who do business with EVEN. (*See* **Exhibit 45**, Washington's posts targeting Wale).

166.    For example, on December 6, 2025, Washington responded to a post made on X by the Securities and Exchange Commission, stating: "You need to investigate @even_biz and @magisformagic." (*See* **Exhibit 46**).   Three days later, on January 3, 2026, Washington responded to the X post of Pamela Bondi, Attorney General of the United States, and said: "When are you going to indict @magisformagic and @even_biz?." (*See* **Exhibit 47**).

167.    On January 22, 2026, Rodriguez was scheduled to publicly speak in London at Music Ally's Connect Conference.  Minutes before Rodriguez was slotted to speak, Washington, posing as an attendee of the conference, sent a mass email under the title of "New Year New Fraud" to all of the attendees of the conference.  (*See* **Exhibit 48**).

168.    Washington created a fake email address, using the name of one of the attendees of the conference, to send the email and give himself the appearance of legitimacy.

169.    In the January 22, 2026 email, Washington falsely presents himself as an independent investigative body, using this narrative to accuse the EVEN Plaintiffs of fraud, including that the EVEN Plaintiffs were fraudulently "duping" investors to the tune of $10 Million.  Parroting his earlier statements, Washington states falsely that EVEN inflated the number of artists

on its platform, does not have partnerships with leaders in the music industry, and has committed embezzlement and wire fraud.

170.    The January 22, 2026 email also contains a link to a newly created defamatory website, "magrodriguezfraud.com."  After his earlier website was taken down by the domain host, Washington made the Defamatory "fraud" Website to renew his publication of confidential trade secret information.  The Defamatory "fraud" Website contains all the same information as the original taken-down even.biz.biz website and, as with the prior defamatory websites, was created and run by Washington.

171.    The use of the domain name, "magrodriguezfraud.com."  constitutes targeted harassment by permanently associating Mr. Rodriguez's real name with fraud in search engine results.

172.    Washington's statements and the content of the January 22, 2026 email were clearly made with malice given the timing of his email only minutes before Rodriguez was scheduled to speak at the conference and his use of a fake email account created to mimic the name and email address of an actual attendee of the conference.

173.    Washington's repeated harassment of Rodriguez, including tracking his whereabouts and posing as individuals that Rodriguez has contact with, warrant a court order restraining Washington from physically or otherwise contacting Rodriguez, his family members, employees and contractors of EVEN Labs, and any of his associates.

174.    On January 27, 2026, Washington, through the email address nonndanetwork@proton.me, began making false statements that Plaintiffs were engaged in discrimination and antisemitism. (*See* **Exhibit 49**).  The January 27th email includes a false and concocted narrative that Rodriguez threatened violence against a competitor and targeted said

individual because of his Jewish decent.  The statements made were wholly fabricated and used to give a sense of false legitimacy to Washington's own fabricated discrimination claims.

175.    The January 27th email goes on to reference Washington's EEOC Complaint, which as stated above, was not a publicly available document and proves that Washington is behind the pseudonym "No NDA Network."

176.    The February 4, 2026 email sent by Washington from his No NDA Network email account to attendees of Grammy Week (**Exhibit 50**, also discussed above), contains many of Washington's other signatory false and defamatory statements, falsely purporting to have "irrefutable evidence" of fraud committed by Rodriguez and EVEN.  Among other things, in addition to the false claims about onboarding discussed above, the February 4th email claims to have reported these fake claims of fraud, as well as unsupported allegations of antisemitism, to law enforcement agencies and advocacy organizations.

177.    The February 4th email also attaches private communications exported by Washington from Rodriguez's HubSpot account.   Washington falsely claims that these communications support his claims of fraud.  As set forth above, Washington was at all times aware of how artist onboarding works on the EVEN platform, and that unclaimed Artist Profiles are not publicly facing unless and until the artist or their representative claims their profile.

178.    Two days later, on February 6, 2026, Washington, using an X account called INSIDER HUB (@insiderhubx), which on information and belief Washington created and runs, launched an additional attack on EVEN.  The account posted: "AT 3 PM EST I AM GOING TO EXPOSE THE BIGGEST FRAUD IN THE MUSIC BUSINESS."  (*See* **Exhibit 51**).

179.    At 3:00 PM on February 6th, the INSIDER HUB X account published a lengthy and false thread attacking EVEN and several of the artists who had recently had successful releases on

EVEN's platform. Entitled "Exposing EVEN, a new platform J Cole, 21 Savage, and Brent Faiyaz are using to get fraudulent sales," the thread accused Plaintiffs and several of their partnering artists of using the EVEN platform to commit fraud and deceive investors. (*See* **Exhibit 52**). Among other things the false statements include claims of "fake sales for artists" and the use of "bots" to increase sales. None of that is true. The defamatory post also publicizes the Copyright Lawsuit to falsely claim that EVEN is distributing music without a license, when in reality, EVEN has had only a single accusation of copyright infringement despite tens of thousands of releases, and it has ample defenses in the Copyright Lawsuit.

180.     The contents of the February 6th thread are clearly identifiable as Washington's pattern of false and defamatory statements targeted at Plaintiffs. As further proof of Washington's direct link to INSIDER HUB, Plaintiffs have documentation that Washington exported Rodriguez's communications, which were later posted by INSIDER HUB, from EVEN's HubSpot while he was still working as a contractor for EVEN. (*See* **Exhibit 53**).

181.     Washington attaches the same exported document from his February 4th email in the INSIDER HUB post. As stated above, Washington's knowledge of EVEN's onboarding makes clear that he is aware that his statements are false.

182.     Other X users quickly began commenting that INSIDER HUB was just No NDA Network, commenting "*InsiderHub and it's just NoNDA*" and "*wait so is this really no nda 2.0.*"

183.     On February 9, 2026 and again on February 14, 2026 Washington began feeding, and on information and belief, paying "influencers" on social media platforms such as TikTok to regurgitate the defamatory statements made about the EVEN Plaintiffs. The TikTok posts republish INSIDER HUB'S X posts as well as the Copyright Lawsuit and contain further defamatory statements surrounding false claims that EVEN is committing fraud and recording

false sales.

184.     Washington made all of the foregoing statements over email and in social media posts with malicious intent to cause professional, personal and financial harm to the EVEN Plaintiffs, to disparage the EVEN Plaintiffs after his termination by spreading false information, and to disrupt EVEN's ability to fairly conduct its business.

185.     EVEN has incurred actual costs and damages because of Washington's intentionally deceptive acts, including devoting significant time and resources to respond to Washington's false statements, incurring public relations, legal, and other professional fees.  The costs and expenses incurred are in excess of $75,000, in an amount to be determined at trial.

***The Frivolous Discrimination Lawsuit***

186.     On February 16, 2026 Washington filed a frivolous employment discrimination claim against EVEN and Rodriguez (the "Employment Lawsuit").  Following the filing of the Employment Lawsuit, Washington continues to feed and pay blogs and influencers to repost the pleadings in that case along with Washington's false narrative that he was wrongfully terminated by EVEN.  (*See* examples, at **Exhibits 54, 55, 56,** and **57).**

187.     Among other things, Washington claims that he was mischaracterized as an independent contractor when he was purportedly a full-time employee.  While Washington's employment status is not a reason why he could not have been dismissed for cause, or even without cause, Washington knows this allegation is false.  Both Washington and his prior counsel have stated in written communications that he was not a full-time employee at EVEN and therefore all claims that Washington now makes to the contrary are simply an attempt to defame EVEN and falsely paint the company as disloyal to its employees.  (*See* **Exhibit 58**, a July 5, 2024 email from counsel for Washington discussing his contractor status and **Exhibit 42**, wherein Washington states over text that, "I wasn't a full time employee.").

188.    Washington's publication of false and defamatory statements through third party accounts was done with malice to negatively affect the EVEN Plaintiffs and impede EVEN and Rodriguez's ability to conduct business.  Washington is aware that the statements made in the Employment Lawsuit and the statements fed to third party social media publishers are false.

189.    The Employment Lawsuit further solidifies the fact that Washington is running the pseudonymous email and social media accounts discussed above because the complaint parrots the false statements he has been making since September 2025.

190.    On February 21, 2026, Washington appeared on an "exclusive" basis with World Music Views under the title of "EXLUSIVE: FORMER EVEN LABS EXECUTIVE D-DOT SPEAKS OUT ON UMG DEAL, DIRECT-TO-FAN FUTURE, AND LAWSUIT AGAINST PLATFORM," wherein he makes false statements about his employment status at EVEN, the nature of and his involvement in the Copyright Lawsuit, and falsely claims that he was wrongfully terminated.  (*See* **Exhibit 59**).

191.    On February 23, 2026, Washington, on information and belief, solicited music industry publication Digital Music News to republish the content of his February 21st interview. The article, "UMG, J. Cole Partner EVEN Is Now Battling a Lawsuit Over Discrimination, Sexual Misconduct, and Labor Violations" parrots Washington's false and defamatory statements about the EVEN Plaintiffs.  (*See* **Exhibit 60**).  The Digital Music News article suggests that Washington was "randomly added" to the Copyright Lawsuit because he was separately suing EVEN for discrimination, a claim that is false and wholly unsupported by the clear timeline of the case filings. Washington was added to the Copyright Lawsuit in October 2024, he was terminated in September 2025, and he filed his frivolous Employment Lawsuit in February 2026.

192.    Both February articles mention a deal EVEN had just closed with a major music

label and show Washington's clear intent to ride the coattails of that deal to publicize his false and defamatory narrative abusing EVEN's name and goodwill. The articles are just another tool Washington has used to interfere with EVEN's current and prospective business partnerships and cause EVEN to expend considerable time and resources correcting the false narrative Washington is promoting.

## COUNT I – DEFAMATION

193.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

194.    Defendant Washington has made the foregoing false and defamatory statements regarding, *inter alia*, the EVEN Plaintiffs' business practices and engagement in fraudulent activities.

195.    Defendant Washington made false statements which were emailed directly to the EVEN Plaintiff's business partners, prospective business partners, investors, prospective investors, artists, and the press, and he posted them on the public Internet, as well as the public forums X, Bluesky, Instagram, Reddit, Disqus, and more in an effort to cause the EVEN Plaintiffs public scorn, hatred, contempt and/or ridicule, thereby discouraging others in the community from associating with the EVEN Plaintiffs.

196.    Defendant Washington has also caused, through the solicitations of third parties, the publication and republication of his false and defamatory statements. Washington contributed to these parties' own defamatory statements. Namely, because Washington knew that his statements made to third parties were false and could reasonably anticipate that these parties would make defamatory statements on his behalf.

197.    Defendant Washington's statements constitute defamation because they impugn the

EVEN Plaintiffs' honesty, trustworthiness, dependability, and professional fitness and abilities by falsely claiming, among other things: that the EVEN Plaintiff's inflated the number of accounts it has with artists signed to major labels; presented false information to potential investors; misrepresented EVEN's current profits to investors; misrepresented current partnerships with major music labels to investors; stole from artists; and committed securities fraud.

198.    Defendant Washington knew that each of the statements described above was false.

199.    Each of the statements described above are not protected opinion, hyperbole, and none of them are substantially true.

200.    Each of the statements described above was defamatory *per se* as the statements tend to harm Plaintiffs' reputation and to deter third parties from associating or doing business with Plaintiffs, and also portrayed Plaintiffs in a false light.

201.    Defendant Washington's statements are ongoing in that the statements are currently published and have been republished, and that he posts new content that is similar in nature seemingly every day.

202.    Defendant Washington's statements have harmed EVEN's professional reputation, standing in the music industry, and relationships with former, current, and prospective business partners and investors.  Defendant Washington's defamatory statements have caused EVEN economic harm in the significant time and expense devoted to public relations and legal fees associated with Mr. Washington's false statements. Defendant Washington's defamatory statements have also harmed Rodriguez's professional reputation and standing in the music industry, and placed various members of Rodriguez's family and EVEN's business in fear.

203.    For this count of defamation, Plaintiffs seek:

(a)    Preliminary and permanent injunctive relief prohibiting Defendant

Washington from further making or publishing false statements of fact that constitute defamation *per se* or portraying the EVEN Plaintiffs in a false light, made with an intent to divert business from Plaintiffs; and

(b)    Compensatory, presumed, special and punitive damages in excess of $75,000 and in an exact amount to be determined at trial, their costs and attorneys' fees, and such other and further relief as this Court deems just and proper.

## COUNT II – TRADEMARK INFRINGEMENT (15 U.S.C. § 1125 and 1132)

204.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

205.    Plaintiff EVEN has federally registered trademark rights to the name EVEN for "software as a service (SAAS) services featuring software for artists and content creators to distribute music, manage fan engagement, analyze audience data, and sell digital content directly to fans." The mark is a distinctive mark in the business of music and technology.

206.    Plaintiff EVEN's website, www.even.biz, is distinctive and has been well known in the field of musical artist representation since at least 2023, and was so at the time Defendant registered/used the domain www.evenbiz.biz, the Defamatory ".biz" Website, as well as EVEN's logo throughout the various published statements discussed above.

207.    The domain name registered by Defendant is confusingly similar to Plaintiff's website, as are the use of EVEN's logo on the other statements.

208.    Defendant Washington registered and used the domain name and the logo with a bad-faith intent to profit from its published misrepresentations of fact concerning Plaintiff EVEN's business, targeting EVEN's present and prospective partners, investors, and customers with the Defamatory Emails including links to the Defamatory ".biz" Website and the other statements.

209.    The Defamatory ".biz" Website and the other uses of EVEN's logo by Washington

are confusing, likely to cause confusion, and have caused EVEN harm.

210.    The use of EVEN's logon on the Defamatory "fraud" Website is similarly likely to cause confusion and have caused EVEN harm.

211.    Plaintiff EVEN seeks injunctive relief in the form an order requiring Washington to cease and desist any further use of EVEN's logo or any similar or confusingly similar uses of EVEN's logo including on magrodriguezfraud.com.

212.    Plaintiff EVEN further pleads entitlement to statutory damages of up to $100,000 pursuant to 15 U.S.C. § 1117, or its actual damages, whichever is higher, in an amount to be determined at trial, as well as its attorneys' fees and costs.

## COUNT III – CYBERSQUATTING (15 U.S.C. § 1125(d))

213.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

214.    Plaintiff EVEN has federally registered trademark rights to the name EVEN for "software as a service (SAAS) services featuring software for artists and content creators to distribute music, manage fan engagement, analyze audience data, and sell digital content directly to fans."  The mark is a distinctive mark in the business of music and technology.

215.    Plaintiff EVEN's website, www.even.biz, is distinctive and has been well known in the field of musical artist representation since at least 2023, and was so at the time Defendant registered/used the domain www.evenbiz.biz, the Defamatory ".biz" Website.

216.    The domain name registered by Defendant is confusingly similar to Plaintiff's website.

217.    Defendant Washington registered and used the domain name with a bad-faith intent to profit from its published misrepresentations of fact concerning Plaintiff EVEN's business,

targeting EVEN's present and prospective partners and customers with the Deceptive Emails including links to the Deceptive Website.

218.    Plaintiff EVEN seeks injunctive relief in the form of transfer of the Defamatory ".biz" Website's domain, www.evenbiz.biz to Plaintiff EVEN's control or its outright cancellation.

219.    Plaintiff EVEN further pleads entitlement to statutory damages of up to $100,000 pursuant to 15 U.S.C. § 1117(d), or its actual damages, whichever is higher, in an amount to be proven at trial, plus its attorneys' fees and costs.

## COUNT IV – FEDERAL TRADE SECRET MISAPPROPRIATION

220.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

221.    Plaintiff owns and maintains trade secrets within the meaning of 18 U.S.C. § 1839(3), including nonpublic information such as collections of email addresses and contact information for current and prospective business partners, investors, and customers, as well as the compiled data linked to Artist Profiles created as part of EVEN's ordinary business practices, and other confidential and proprietary information including draft slide decks and other business communications (the "Trade Secrets").

222.    The Trade Secrets derive independent economic value from not being generally known or readily ascertainable by proper means and are used in connection with products/services placed in, or intended for, interstate commerce. *See* 18 U.S.C. § 1836(b)(1).

223.    Plaintiff takes reasonable measures to keep the Trade Secrets secret, including restricted access to aggregated information.

224.    While employed as an independent contractor, Defendant Washington obtained access to portions of the Trade Secrets by virtue of his employment, and, upon information and

belief, stored such Trade Secrets on his company-owned laptop and cell phone, consistent with Plaintiff's policies for confidentiality and restricted use, and may have also downloaded the information onto other storage devices.

225.    While employed as an independent contractor at EVEN, Washington accessed and offered EVEN trade secrets to and adverse party in the Copyright Lawsuit wherein both EVEN and Witherington are named defendants.

226.    Defendant understood his obligations to maintain confidentiality as an independent contractor of EVEN, and had knowledge of the sensitive nature of the Trade Secret information and its economic importance as a source of value for EVEN.

227.    Without Plaintiff's consent, Defendant his maintained access to the Trade Secrets by improper means as defined in 18 U.S.C. § 1839(6), including retaining company-owned devices issued to him.

228.    Defendant's misappropriation has occurred, and continues to occur, at least since September 4, 2025.

229.    Defendant's misappropriation has occurred within and outside the state of Maryland, and by virtue of contacting individuals in various states, has affected EVEN's interstate commerce.

230.    Defendant's conduct was willful and malicious, undertaken to compete unfairly and to injure Plaintiff's business.

231.    Defendant's actions have caused, and unless enjoined will continue to cause, irreparable harm, including loss of goodwill, market share, and the secrecy and value of the Trade Secrets, for which there is no adequate remedy at law.

232.    Therefore, Pursuant to 18 U.S.C. § 1836(b)(3), Plaintiff seeks for this Count IV:

(a)     Injunctive relief to prevent actual or threatened misappropriation, including: (*i*) cessation of further disclosure; (*ii*) return or destruction of all Trade Secrets and materials containing them; and (*iii*) return of the Stolen EVEN Devices, to the extent not already ordered by the Court in the Copyright Lawsuit;

(b)     Damages for actual losses sustained;

(c)     Exemplary damages for willful and malicious misappropriation pursuant to 18 U.S.C. § 1836(b)(3)(C);

(d)     Attorneys' fees and costs for willful and malicious misappropriation and in connection with this action (see 18 U.S.C. § 1836(b)(3)(D)); and

(e)     Such other and further relief as the Court may deem just and proper under the circumstances.

## <u>COUNT V – TRADE SECRET MISAPPROPRIATION</u><br><u>(MD. CODE, COMM. LAW § 11-1201 et seq.)</u>

233.     Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

234.     Plaintiff owns and maintains "trade secrets" within the meaning of Md. Code, Comm. Law § 11-1201(e), including nonpublic compilations of email addresses and contact information for current and prospective business partners, investors, and customers; compiled data linked to Artist Profiles created in the ordinary course of EVEN's business; and other confidential and proprietary materials, including draft slide decks and business communications (the "Trade Secrets").

235.     The Trade Secrets derive independent economic value from not being generally known to, and not readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use, and Plaintiff has invested substantial time and

resources to develop and maintain them.

236.    Plaintiff takes reasonable measures to keep the Trade Secrets secret, including restricting access to aggregated information and limiting use and disclosure of such information to authorized personnel and contractors subject to duties of confidentiality.

237.    While engaged as an independent contractor, Defendant Washington obtained access to portions of the Trade Secrets by virtue of that engagement, and, upon information and belief, stored such Trade Secrets on company-owned devices (the Stolen EVEN Devices) consistent with Plaintiff EVEN's policies.

238.    While employed as an independent contractor at EVEN, Washington accessed and offered EVEN trade secrets to and adverse party in the Copyright Lawsuit wherein both EVEN and Witherington are named defendants.

239.    Defendant Washington understood and accepted duties to maintain secrecy and limit use arising from his relationship with Plaintiff EVEN, and knew the Trade Secrets were confidential and economically valuable to EVEN.

240.    Without Plaintiff EVEN's consent, Defendant Washington has acquired, retained, disclosed, and/or used the Trade Secrets through improper means, including retaining company-owned devices and information after termination, and breaching duties to maintain secrecy and limit the use of EVEN's proprietary information.

241.    Defendant Washington's misappropriation occurred and is continuing since at least September 4, 2025, and constitutes actual and threatened misappropriation under Maryland law.

242.    Defendant Washington's conduct occurred at least in part in Maryland and has harmed Plaintiff EVEN's Maryland-based interests, customers, and business relationships.

243.    Defendant Washington's conduct was willful and malicious, undertaken to injure

Plaintiffs and to damage Plaintiffs' business interests and reputation.

244.    Defendant's actions have caused, and unless enjoined will continue to cause, irreparable harm, including the loss of goodwill, loss of market share, and a loss of the secrecy and value of the Trade Secrets, for which there is no adequate remedy at law.

245.    Therefore, pursuant to Md. Code, Comm. Law §§ 11-1202-1204, Plaintiff seeks the following relief:

(a)    Injunctive relief to prevent actual or threatened misappropriation, including: (*i*) cessation of any further use or disclosure; (*ii*) immediate return or destruction of all Trade Secrets and materials containing them; and (*iii*) the return of the Stolen EVEN Devices, to the extent not already ordered by the Court in the Copyright Lawsuit;

(b)    Damages for Plaintiff's actual losses sustained;

(c)    Exemplary damages for willful and malicious misappropriation in an amount not exceeding twice the award granted under § 11-1203(a);

(d)    Reasonable costs and attorneys' fees for such willful and malicious misappropriation; and

(e)    Such other and further relief as this Court may deem just and proper under the circumstances.

## COUNT VI – REPLEVIN

246.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

247.    Fed. R. Civ. P. 64 provides a party access to remedies providing for seizure of property, including the common law right of replevin.

248.    Plaintiff EVEN is the owner of, and has the immediate right of possession to, the

Stolen EVEN Devices, having a total value that does not exceed $3,000.

249.    Defendant Washington currently possesses and wrongfully detains the Stolen EVEN Devices without Plaintiff EVEN's consent and without lawful justification.

250.    Plaintiff EVEN demanded return of the property, and Defendant Washington refused the demand and continues to hold the Stolen EVEN Devices.

251.    If immediate possession is not restored, Plaintiff EVEN faces a substantial risk that the Stolen EVEN Devices, and the information contained therein, will be concealed, moved, damaged, sold, or otherwise dissipated, causing irreparable or difficult to quantify harm.

252.    Plaintiff therefore requests this court issue a Writ of Replevin, directing the immediate delivery of the Stolen EVEN Devices to Plaintiff EVEN pending final judgment, with such security as the Court may deem appropriate, along with any necessary preservation directives to prevent transfer, concealment, or damage to the Stolen EVEN Devices before delivery, and such other and further relief as the Court may deem just and proper under the circumstances.

## COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

253.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

254.    Washington refused to return the EVEN Devices so that he could maintain access to EVEN's confidential information and contact list.

255.    Washington wrongfully accessed EVEN's server to unlawfully obtain the contact information for EVEN's current, former, and prospective business partners and investors.

256.    Washington colluded with Babygrand and offered to provide EVEN's trade secrets in exchange for his release from the Copyright Lawsuit and the payment of cash or a job.

257.    Washington directly targeted EVEN's former, current and prospective business

partners and investors as the recipients of his Defamatory Emails and the Defamatory Websites so that individuals and business would not conduct business with EVEN.

258.    Washington intentionally made false statements about the EVEN Plaintiff's business practices, *inter alia,* that the EVEN Plaintiffs committed fraud, embezzlement, and wire fraud.

259.    Washington publicly published EVEN's back-end and proprietary information in order to make false statements about the legitimacy of the EVEN Plaintiff's business.

260.    Washington made these false statements and contacted these individuals and businesses for the unlawful or wrongful purpose to causing damage to the EVEN Plaintiff's lawful business.

261.    Washington made these false statements in his social media posts and tagged numerous news outlets for the unlawful or wrongful purpose to causing damage to the EVEN Plaintiff's lawful business.

262.    The EVEN Plaintiffs suffered actual harm from Washington's actions, namely in the form of lost time and resources and significant economic effect brought on by the potential loss of investments.

263.    Washington directly targeted EVEN's former, current and future business partners and investors as the recipients of his Defamatory Emails, the Defamatory Websites, and the defamatory posts, so that individuals and business would not conduct business with EVEN.

264.    The EVEN Plaintiffs suffered actual harm from Washington's actions, namely in the form of lost time and resources and significant economic effect brought on by the potential loss of investments.

265.    The EVEN Plaintiffs seek an injunction ordering the cessation of such statements

and their actual damages in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants, and grant the following relief:

(a)     Compensatory and statutory damages in an amount to be determined at trial, but not less than $75,000;

(b)     A temporary restraining ordering Washington to cease all public and private statements regarding the EVEN Plaintiffs and the immediate removal of the Defamatory email accounts operated by Washington, the Defamatory Websites, and all defamatory social media posts, as well as all use of EVEN's logo or any variant thereof;

(c)     A preliminary injunction ordering Washington to cease all public and private statements regarding the EVEN Plaintiffs and the immediate removal of the Defamatory email accounts operated by Washington, the Defamatory Websites, and all defamatory social media posts, as well as all use of EVEN's logo or any variant thereof;

(d)     A permanent injunction ordering Washington to cease all public and private statements regarding the EVEN Plaintiffs and the immediate removal of the Defamatory email accounts operated by Washington, the Defamatory Websites, and all defamatory social media posts, as well as all use of EVEN's logo or any variant thereof;

(e)     An injunction ordering the impoundment and return of the Stolen EVEN Devices and any other storage device where Washington is maintaining any of EVEN's documents or other information;

(f)     A restraining order preventing Washington from physically or otherwise contacting Rodriguez, Rodriguez' family, or any employee or contractor of EVEN.

(g)    All Attorneys' fees and costs of this action and all fees and costs associated with addressing the defamatory statements; and

(h)    Such other and further relief as this Court may deem necessary to do justice under the circumstances even if not demanded herein.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims so triable.


Dated:   February 26, 2026                    Respectfully Submitted,

                                              PRACTUS LLP

                                              _____/s/ Matthew B. McFarlane_____
                                              Matthew B. McFarlane, Esq. (Bar. No. 30689)
                                              1014 W 36 St., Ste. 103
                                              Baltimore, MD 21211
                                              Tel. (410) 657-8633
                                              Fax. (646) 663-4283
                                              matthew.mcfarlane@practus.com

                                              David Leichtman, Esq.  (*pro hac vice* to be filed)
                                              Sherli Furst, Esq . (*pro hac vice* to be filed)
                                              Emma Hoffmann, Esq. (*pro hac vice* to be filed)
                                              Zoe Neefe, Esq. (*pro hac vice* to be filed)
                                              ELLENOFF, GROSSMAN, AND SCHOLE LLP
                                              1345 Avenue of the Americas, 11th Floor
                                              New York, NY 10105
                                              Phone: (212) 370-1300
                                              dleichtman@egsllp.com
                                              sfurst@egsllp.com
                                              ehoffmann@egsllp.com
                                              zneefe@egsllp.com

                                              *Attorneys for Plaintiffs*
                                              *EVEN Labs Inc. and Enrique "Mag" Rodriguez*